UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

150/154

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-6906 PSG (GJSx) | Date | January 6, 2023 |
|---|---|---|---|
| Title | teamLab Inc. v. Museum of Dream Space, LLC et al. | | |

| Present: The Honorable | Philip S. Gutierrez, United States District Judge |
|---|---|

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):** **Order DENYING Plaintiff's motion to exclude expert testimony, DENYING Defendants' motion for summary judgment, and GRANTING IN PART and DENYING IN PART Plaintiff's motion for summary judgment.**

Before the Court are three motions. The first is a motion to exclude the expert testimony of Dr. Kimberly Connerton filed by Plaintiff teamLab Inc. ("Plaintiff"). *See generally* Dkt. # 152 ("*Mot. to Exclude*"). Defendants Dahooo American Corporation ("Dahoo") and Museum of Dream Space, LLC ("MODS") (collectively, "Defendants") opposed. *See generally* Dkt. # 163 ("*Mot. to Exclude Opp.*"). Plaintiff replied. *See generally* Dkt. # 164 ("*Mot. to Exclude Reply*"). The remaining motions are Plaintiff's and Defendants' cross motions for summary judgment. *See generally* Dkt. # 150 ("*Defs. MSJ*"); Dkt. # 154 ("*Pl. MSJ* "). Both parties opposed each other's motions and replied. *See generally* Dkts. # 171 ("*Defs. Opp.*"); 172 ("*Pl. Opp.*"); 179 ("*Pl. Reply*"); 180 ("*Defs. Reply*"). The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the moving, opposing, and reply papers, the Court **DENIES** Plaintiff's motion to exclude Dr. Kimberly Connerton's expert testimony, **DENIES** Defendants' motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment.

## I. Background

The facts have been heavily recounted in past orders, so the Court only briefly summarizes them here. Plaintiff is a Japanese interdisciplinary art collective that is internationally known for its immersive digital art exhibits. *See Plaintiff's Statement of Uncontroverted Facts*, Dkt. # 171-3 ("*PSUF*"), ¶¶ 1–7. Defendant MODS, a wholly owned

subsidiary of Defendant Dahoo, owns and operates an art museum in Beverly Hills, California, called the Museum of Dream Space. *Id.* ¶ 44.

Plaintiff alleges that Defendants directly, contributorily, and/or vicariously infringed Plaintiff's digital art exhibits ("TL Exhibits" or the "Exhibits") and photos of them ("TL Images" or the "Images"), which are displayed on Plaintiff's website. *See generally Second Amended Complaint*, Dkt. # 75 ("SAC"). Specifically, Plaintiff claims that two of Defendants' exhibits—*Galaxy Dream* and *Season Dream* ("MODS Exhibits")—are substantially similar infringing versions of Plaintiff's exhibits *Crystal Universe* and *Boundaries*. *Id.* ¶¶ 32, 43. And related to this allegation, Plaintiff also claims Defendants vicariously and/or contributorily infringed on *Crystal Universe* and *Boundaries* by permitting the infringing MODS Exhibits to be featured in a Justin Bieber Music Video ("Bieber Music Video"). *PSUF* ¶¶ 116–18. Further, to attract attention to their own museum, Defendants posted pictures of Plaintiff's *Boundaries* and *Crystal Universe* as well as three other exhibits—*Forest*, *Particles*, and *Wander*—on their social media accounts. *See Defendants' Statement of Uncontroverted Facts* ("*DSUF*") ¶¶ 27–30; *SAC* ¶¶ 67, 83. The posted pictures included TL Images but also encompassed other photos of the TL Exhibits captured by unknown persons ("Other Images") (collectively, the "Photographed Works"). *See PSUF* ¶¶ 97–104.

Plaintiff sued in August 2019. *See generally* Dkt. # 1. Defendants moved to dismiss shortly thereafter, *see generally* Dkt. # 21, but Plaintiff amended its complaint before the Court ruled on the pending motion to dismiss, *see generally* Dkt. # 28. Defendants did not move to dismiss again, and the parties proceeded to discovery. In March 2022, the Court granted a motion for spoilation of evidence, awarding Plaintiff an adverse inference instruction at trial because Defendants destroyed various electronic messages that Plaintiff believed would have revealed Defendants' intent to infringe Plaintiff's works as well as Dahoo's involvement in any infringing activity. *See* Dkt. # 149 at 6–7; *see also PSUF* ¶¶ 333, 335–39.

Immediately thereafter, the parties filed their respective motions for summary judgment, and Plaintiff filed a *Daubert* motion to exclude the opinions of Defendants' expert, Dr. Kimberly Connerton. *See generally Pl. MSJ*; *Defs. MSJ*; *Mot. to Exclude*. On July 12, 2022, the Court denied Plaintiff's summary judgment motion, granted summary judgment to Defendants on the issue of standing alone, and denied Defendants' summary judgment motion and Plaintiff's *Daubert* motion as moot. *See generally* Dkt. # 193 ("*Summ. J. Order*"). Specifically, 17 U.S.C. § 411(a) requires registration with the United States Copyright Office ("USCO") before filing suit for infringement, and it is undisputed that Plaintiff never registered any of its works. *See Pl. MSJ* 11:11–12:10. The Court initially held that Plaintiff had failed to establish that its works

qualified as foreign works and were thus exempt from the pre-suit registration requirement. *See Summ. J. Order* at 4–6. Plaintiff subsequently filed a motion for reconsideration, *see generally* Dkt. # 203 ("*Recons. Mot.*"), which the Court granted and accordingly took the parties' motions under submission, *see generally* Dkt. # 221 ("*Recons. Order*").

II. Plaintiff's *Daubert* Motion

The Court first resolves Plaintiff's motion to exclude the expert opinions of Dr. Kimberly Connerton. *See generally Mot. to Exclude*.

Federal Rule of Evidence 702 governs the admissibility of expert opinion. *See* Fed. R. Evid. 702(b)–(d). Expert opinion must involve scientific or technical knowledge. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). And the opinion is admissible if it is based on sufficient facts or data, it is the product of reliable principles and methods, and the expert reasonably applies the principles and methods to the facts of the case. *See* Fed. R. Evid. 702(b)–(d); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014). The Rule 702 factors are broadly summarized as requiring "reliability, relevancy, and assistance to the trier of fact." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 549 (C.D. Cal. 2014) (citing *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998)).

The trial court is vested with broad discretion in assessing the admissibility of an expert's opinion. *See United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987). "The trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable" and relevant. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011). It is Defendants' burden to prove by a preponderance of the evidence that their expert's testimony meets these admissibility requirements. *See Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

Plaintiff argues that Defendants' expert, Dr. Connerton, who is set to opine about the objective differences between the TL and MODS Exhibits, should be excluded for two reasons: (1) Dr. Connerton applied an incorrect standard when analyzing the parties' works; and (2) Dr. Connerton issued her report without considering later-produced evidence. *See Mot. to Exclude* 1:6–17; *see also Declaration of Benjamin S. Halperin*, Dkt. # 153 ("*Halperin Decl.*"), ¶ 3, Ex. B (Dr. Kimberly Connerton Expert Report), 2 ("*Connerton Rep.*"); *see also id.* ¶ 4, Ex. C (Dr. Kimberly Connerton Expert Rebuttal Report) ("*Connerton Rebuttal Rep.*"). The Court,

however, finds that Dr. Connerton's expert opinion is admissible because it is based on reliable principles and sufficient data.

First, the Court does not find the standard Dr. Connerton applied problematic. Specifically, Dr. Connerton applied a standard that the Court would ultimately have to apply should it find that *Crystal Universe* and *Boundaries* are entitled to only "thin" copyright protection. *See Mot. to Exclude Opp.* 10:8–27. Dr. Connerton's analysis is only going to be used by the Court in evaluating the objective differences between the TL and MODS Exhibits; it cannot be used to aid a jury. *See Skidmore as Trustee for Randy Craig Wolf Trust v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) ("[T]he intrinsic test," which is left to the jury, "test[s] for similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance." (citation omitted)). And regardless of what standard the Court applies, Dr. Connerton's insight into how the Exhibits relate to works of other artists and their differences can still be useful.

The Court is also unpersuaded by Plaintiff's second argument that Dr. Connerton failed to consider later-produced materials. *See Mot. to Exclude* 7:5–10. "[A]n expert need not consider *every* possible factor to render a 'reliable' opinion." *Bilmore Assocs., L.L.C. v. Thimmesch*, No. 2:02–cv–2405–HRH, 2007 WL 5662124, at *8 (D. Ariz. Oct. 15, 2007) (quoting *MicroStrategy Inc.v. Bus. Objects, S.A.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005)). Dr. Connerton relied on the facts and data available to her at the time she issued her report. *See Mot. to Exclude Opp.* 3:3–14. While the additional materials may have proved "helpful," *see Mot. to Exclude* 7:15-16 (citing *Deposition of Dr. Connerton*, Dkt. #153-1, 77:10–78:25, 177:3–179:3), this again only goes to the weight that should be given to Dr. Connerton's report.

The Court therefore **DENIES** Plaintiff's *Daubert* motion.

III. <u>Cross Motions for Summary Judgment</u>

A. <u>Legal Standard</u>

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 19-6906 PSG (GJSx) | Date | January 6, 2023 |
|---|---|---|---|
| Title | teamLab Inc. v. Museum of Dream Space, LLC et al. | | |

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party will have the burden of proof at trial, the movant can prevail by pointing out that there is an absence of evidence to support the nonmoving party's case. *See id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all reasonable inferences in the light most favorable to the nonmoving party. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be capable of being presented at trial in a form that would be admissible in evidence. *See* Fed. R. Civ. P. 56(c)(2). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

B. Evidentiary Objections

As a preliminary matter, Defendants assert evidentiary objections along with their opposition to Plaintiff's motion for summary judgment. *See generally* Dkt. # 171-4. To the extent that the Court relies on objected-to evidence, it relies only on admissible evidence and, therefore, the objections are overruled. *See Godinez v. Alta-Dena Certified Dairy LLC*, No. CV 15-01652 RSWL (SSx), 2016 WL 6915509, at *3 (C.D. Cal. Jan. 29, 2016).

C. Discussion

The parties each move for summary judgment as to all claims that Defendants infringed the TL Exhibits and Images. *See generally Pl. MSJ*; *Defs. MSJ.*

To prevail on a claim of copyright infringement, a plaintiff must show (1) that he or she owns a valid copyright in the infringed work and (2) that defendant violated the plaintiff's exclusive rights under the Copyright Act or copied protected elements of plaintiff's work. *See Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018); *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004).

Copyright law, however, has international implications, which are principally governed by the Berne Convention and Universal Copyright Convention. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F.4th 1054, 1078–79 (9th Cir. 2022) (citing *Golan v. Holder*, 565 U.S. 302, 306 (2012)). As a party to the Conventions, the United States agrees to extend the same protections to foreign copyright holders as they would to domestic copyright holders without requiring the same formalities. *See id.* at 1078. As such, foreign works are exempt from registering with the USCO under 17 U.S.C. § 411(a), which is otherwise a prerequisite for standing. *See Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 885 (2019) ("Congress removed foreign works from § 411(a)'s dominion in order to comply with the Berne Convention['s] . . . bar on copyright formalities for such works."). Further, when a foreign works author brings an infringement action in the United States, foreign law determines copyright ownership, while "U.S. law governs whether infringement occurs." *Unicolors*, *Inc.*, 52 F.4th at 1079 (citation omitted); *see also* 5 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* ("*Nimmer on Copyright*") § 17.05[A] (recognizing that such an approach is consistent with the principle of "national treatment" provided under the Conventions).

The parties each raise arguments as to standing and copyright ownership, infringement, damages, and Dahoo's liability as a parent corporation that the Court never reached in its prior order. *See generally Pl. MSJ*; *Defs. MSJ*; *see also Summ. J. Order*. The Court now addresses the merits of these arguments in turn.

*i. Foreign Works Exemption*

The first matter before the Court, which was the subject of its prior summary judgment and reconsideration orders, is whether Plaintiff's Exhibits and Images qualify as foreign works. *See generally Summ. J. Order*; *Recons. Order*. After reviewing the record, the Court is satisfied the TL Exhibits and Images are foreign works and exempt from § 411(a)'s pre-suit registration requirement.

Whether a work is a United States or foreign work is inextricably intertwined with publication. A work is a "United States work" if it is (1) "first published" in the United States or "simultaneously published in the United States and another treaty party," or (2) unpublished and "all the authors of the work are nationals, domiciliaries, or habitual residents of the United States." *Wall-Street.com, LLC*, 139 S. Ct. at 885; *see also* 17 U.S.C. § 104. Neither party disputes that Plaintiff's works were created abroad by Japanese domiciliaries.[1] *See PSUF* ¶¶ 8,

[1] Japan is a treaty state under the Berne Convention.

271–75. The parties instead dispute whether the TL Exhibits and Images were published, and if so, where. *See Defs. Opp.* 10:6–15:20; *Pl. Reply* 2:15–3:4.

Defendants advance a novel theory that Plaintiff published its works in the United States and abroad via the world wide web by displaying the TL Images on its website. *See Defs. Opp.* 11:15–20. *See PSUF* ¶¶ 290–94, 297. Were the Court to accept this theory of publication, then both the TL Exhibits and Images would be published because 17 U.S.C. § 401(b)(2) infers publication of a preexisting work—the Exhibits—through an authorized publication of a derivative work—the Images. *See* 1 *Nimmer on Copyright* § 4.12[A] & n.2. As such, Plaintiff would arguably be subject to § 411(a)'s registration requirement and lack standing to sue for infringement.

The Ninth Circuit has yet to weigh in on the extent to which publication occurs over the internet and how that would impact a foreign author's status under § 411(a). And although some courts have seemed to embrace a broad theory of publication through a mere display of images or recordings on the internet, *see, e.g.*, *Getaped.com, Inc. v. Cangemi*, 188 F. Supp. 2d 398 (S.D.N.Y. 2002), the Court is not inclined to do so here. Rather, the Court follows the guidance of the *Compendium of U.S. Copyright Practices* ("*Compendium*"), which courts consistently rely on and often afford it greater weight than other secondary sources. *See, e.g.*, *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405 (2017) (citing the *Compendium* throughout its decision).

The *sin non qua* of publication is the transfer of ownership rights in any given work; the number of people who view the work is irrelevant. 17 U.S.C. § 101; *Compendium* § 1908 (2021) (citing H.R. Rep. No. 94-1476, at 138 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 5675). Publication occurs when copies of a work are distributed to the public without explicit or implicit restrictions and "without regard to the manner in which the copies . . . changed hands." *Compendium* § 1902 (2021) (citing H.R. Rep. No. 94-1476, at 138). Accordingly, displaying a work of art does not constitute publication unless accompanied by a public sale or offer of sale. *See id.*; 17 U.S.C. § 101; *see also American Vitagraph, Inc. v. Levy*, 659 F.2d 1023, 1026–27 (9th Cir. 1981) ("[P]ublication has been stated to be 'such a dissemination of the work of art itself among the public, as to justify the belief that it took place with the intention of rendering such work common property.'" (citation omitted)).

Defendants concede that the Images were posted online alongside a copyright notice. *See Defs. Opp.* 15:3–11. But they argue that the notice is irrelevant because the public can visit TL's website and copy any of the images or videos "with just a few clicks." *Id.* The Court thus

understands Defendants' theory to be that of automatic internet publication based on the sole fact that end users can reproduce the work absent the author's authorization. *See id.* 11:26–18 (citing *Getaped.com*, 188 F. Supp. 2d 398).

The Court however cannot reconcile Defendants' interpretation of online publication with the principles stated above. As other courts have recently acknowledged, publication requires "commercial exploitation," which is noticeably lacking when a digital file is merely posted online. *See, e.g.*, *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 99–100 (S.D.N.Y 2020); *Rogers v. Better Bus. Bur. v. Metro. Houston, Inc.*, 887 F. Supp. 2d 722, 730–31 (S.D. Tex. 2012). Additionally, Plaintiff's copyright notice is relevant because publication occurs—via the internet or otherwise—only when the author offers to sell or clearly authorizes reproduction and distribution of its work, which is not present on these facts. *See Compendium* § 1008.3(C). Just as a painting in a gallery is not published because a viewer is permitted to photograph it, a digital image posted online and authorized for display only is not published because an end user right-clicks and saves it. *See id.* §§ 1008.3(C), 1908. And to Plaintiff's point, a contrary conclusion could prove problematic as it may subject foreign works authors "to the very formalities that the Berne Convention eschews." *See Pl. Reply* 7:2–7 (citing *Moberg v. 33T LLC*, 666 F. Supp. 2d 415, 422–23 (D. Del. 2009), and *Wall-Street.com*, 139 S. Ct. at 891).

Rather, the Court is persuaded that the TL Exhibits and Images are unpublished as they have only been made available for public display. *See* 17 U.S.C. § 101. And the Court now doubts that the Exhibits were published through licensing offers to museums. Specifically, Plaintiff's works were never offered "to multiple parties at once, including groups of museums or exhibitors." *See Supplemental Declaration of Yasuhito Hirowatari* ("*Hirowatari Supp. Decl.*"), ¶¶ 4–7. Instead, Plaintiff engaged in direct negotiations with individual exhibitors or licensees to display its Exhibits, discussing in detail the location and installation of the Exhibits and restricting any right to "distribute, sell, or display the works beyond public display in the [agreed-upon] space." *See id.* ¶ 4. And at the time these negotiations and licensing deals occurred, the physical exhibits were not in existence, *see id.* ¶ 6, which also negates publication, *see Compendium* § 1906.3 (offering to distribute copies of a work only constitutes publication if "the copies of phonorecords exist when the offer is made").

The Court therefore finds that the TL Exhibits and Images are exempt from § 411(a)'s pre-suit registration as unpublished foreign works, and Plaintiff has standing to bring this action.

*ii. Valid Copyrights Under Japanese Law*

Although the Court suspects that Plaintiff could satisfy the requirements of copyright ownership under U.S. law, it need not reach that issue. Instead, Japanese copyright law controls as the country with "the closest relationship to the work[s]." *Itar-Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 90–91 (2d Cir. 1998) (applying the law from the country of the work's origin); *see also Unicolors, Inc.*, 52 F.4th at 1079.

The "determination of foreign law is a legal question." *Tobar v. United States*, 731 F.3d 938, 941 (9th Cir. 2013). And under Federal Rule of Civil Procedure 44.1, the Court "may consider any relevant material or source that could aid it in this determination." *See Stoyas v. Toshiba Corp.*, No. 2:15-cv-04194 DDP-JC, 2022 WL 17082663, at *1 (C.D. Cal. Nov. 17, 2022). Both the text of Japan's Copyright Act and the declaration of Plaintiff's expert, Ryoichi Mimura, are instructive. *See generally* Dkt. # 156-1 ("*Mimura Decl.*"). Notably, Mr. Mimura has 45 years of legal experience in Japanese intellectual property law, including serving as Chief Judge at the Intellectual Property Division of the Tokyo District Court and an investigator/judge in charge of intellectual property cases at the Supreme Court of Japan. *See id.* ¶ 1, 5.

Turning to Japanese law, the Copyright Act protects works of authorship by—as relevant here—Japanese nationals, including a corporation. *See* Copyright Act art. 6 (Japan). Accordingly, for valid copyright ownership in Japan, Plaintiff must establish that its Exhibits and Images are "works" recognized by the Japanese Copyright Act and that Plaintiff is the author of those works.

A "work" is defined as a "creatively produced expression of thoughts or sentiments that falls within the literary, academic, artistic, or musical domain." *Id.* art. 2.1.i. This has been understood to include the following general requirements: (1) the work must include thought or emotion; (2) there must be an expression of that thought or emotion; (3) the expression must be creative; and (4) the work must fall within an enumerated category. *See Mimura Decl.* ¶ 7(1). Plaintiff's works meet all four requirements.

First, the Exhibits and their derivatives constitute an "expression of thoughts or sentiments" that fall within the artistic domain—three out of the four requirements. These requirements are practically found when the work is the product of a human's voluntary act of artistic creation and subject to external perception. *See id.* The Exhibits and Images readily meet this low bar as "sculptures[] and other works of fine art," "photographic works," "works of

computer programming," and a compilation of the above, displayed for external perception. *See* Copyright Act art. 10.

Second, Plaintiff's works are creative. This element—most analogous to the U.S. requirement of originality—is to be "construed loosely." *See Mimura Decl.* ¶ 7(1); *cf. Feist Publ'ns, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 346 (1991) (requiring a mere "modicum of creativity" to find originality). Protection will only be denied on this ground when the work is an imitation of a pre-existing work or when "the expression is too inevitable or all to common," akin to the doctrines of merger and *scenes a faire*. *See Mimura Decl.* ¶ 7(1); *cf. Satava v. Lowry*, 323 F.3d 805, 810 (9th Cir. 2003) ("[E]xpressions that are standard, stock, or common to a particular subject matter or medium are not protectable under copyright law."). Plaintiff's Exhibits and the images capturing them encompass digital and/or sculptural artwork and computer programming, which are neither inevitable expressions of the themes they embody nor imitations of pre-existing work. That is not to say that the TL Exhibits are necessarily novel. *See Connerton Rep.* 15–18 (identifying other artists who use similar materials and/or themes). But, in both Japanese and U.S. copyright law, a work need not be novel to be original. *See Mimura Decl.* ¶ 7(1); *Feist Publ'ns*, 499 U.S. at 345. This element is therefore met.

Further, the issues of fixation raised in Defendants' papers are immaterial to the Court's determination of copyright ownership. *See Defs. MSJ* 18:5–19, 20:10–17; *Defs. Opp.* 19:13–26, 22:21–27. Fixation is notably absent from Japan's Copyright Act except in limited cases. *See, e.g.*, Copyright Act art. 2.3. But even when fixation is a requirement under Japanese law, failure to meet this requirement does not prevent the work from qualifying as a protected work of authorship. *See Mimura Decl.* ¶ 7(2). Rather, fixation grants additional rights to authors. *See id.* (citing as examples Articles 26 and 46.2 of the Copyright Act). The Exhibits and Images thus constitute "works" under the Japan's Copyright Act.

Last, Plaintiff is the author of its Exhibits and Images as Japanese law recognizes works-for-hire. *See* Copyright Act art. 15.1. A corporation will be deemed to be an author of a work if (1) the work was created by employees of a corporation in the course of their employment, (2) the corporation makes the work public as that of its own authorship, and (3) no agreement exists to the contrary. *See id.* Here, the TL Exhibits and Images are works-for-hire as they were made by Plaintiff's employees in collaboration with and at the direction of Plaintiff's executives. *See PSUF* 98, 297–302, 563. The creators of the contested works were acting under an employment contract with Plaintiff and agreed to the Rules of Engagement in Workplace, which include terms pertaining to copyright attribution. *See id.* 298–302. And in accordance with Articles 4.1

and 45 of the Copyright Act, the Exhibits and Images have been "made public" under Plaintiff's name either by signage in the museums or through Plaintiff's website. *See id.* 295–97.

The fact that Defendants have identified some images that were not directly taken by Plaintiff's employees is a misdirect. *See Defs. MSJ* 22:7–24. Under both Japanese and U.S. law, Plaintiff retains a copyright in the Other Images as to all elements that derive from the underlying copyrighted work, regardless of whether the Other Images constitute derivatives or reproductions. *See* Copyright Act arts. 15, 28, 47; *Mimura Decl.* ¶ 8(2); *see also DC Comics v. Towle*, 802 F.3d 1012, 1024 (9th Cir. 2015). Accordingly, copyright protection vests in Plaintiff as the author of the Exhibits and Images, and to the extent they are captured by the Other Images.

Plaintiff therefore owns a valid copyright in its works under Japanese copyright law. Accordingly, the Court **GRANTS** summary judgment to Plaintiff on the issue of ownership and **DENIES** summary judgment to Defendants.

*iii. Infringement*

Having determined Plaintiff owns a valid copyright in its Exhibits and Images, the Court considers Plaintiff's claims of direct, vicarious, and/or contributory infringement related to (1) the Photographed Works, (2) the TL Exhibits, *Crystal Universe* and *Boundaries*, and (3) the Bieber Music Video. And as previously stated, U.S. copyright law governs the Court's analysis. *See Unicolor*, 52 F.4th at 1079.

*a. The Photographed Works*

The parties seek summary judgment as to whether Defendants directly or vicariously infringed on Plaintiff's works by displaying TL and Other Images on MODS' social media sites for marketing purposes. *See Pl. MSJ* 21:25–23:23, 24:11–15; *Defs. MSJ* 22:1–24:6. Direct copyright infringement occurs when "the defendant himself violated one or more of the plaintiff's exclusive rights under the Copyright Act." *Ellison*, 357 F.3d at 1076. A defendant is vicariously liable for copyright infringement if he "has the right and ability to supervise infringing activity and also has a direct financial interest in such activities." *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 (9th Cir. 2001).

The record here is clear. Defendant MODS is ultimately liable under either theory of infringement because MODS, directly or through their social media consultants, reproduced and displayed unauthorized copies or derivatives of Plaintiff's Images and Exhibits on its social media sites to market its own exhibits. *See PSUF* 504–518, 521; *DSUF* 27–30. It does not

matter if the infringing posts were made by MODS' consultants given that MODS retains control over both the content that appears on its social media sites and the work of its consultants. *See PSUF* 515–18; *accord Werner v. Evolve Media, LLC*, No. 2:18-cv-7188-VAP-SKx, 2020 WL 3213808, at *5 (C.D. Cal. Apr. 28, 2020). And where the Photographed Works were used to market its own exhibits, MODS had a financial interest in the infringing activity. *See DSUF* 27–30.

In moving for and opposing summary judgment, Defendants mainly rely on evidentiary objections to undisputed facts and evidence, including previously unauthenticated screenshots that captured the Photographed Works on MODS' Facebook page. *See Defs. MSJ* 22:25–23:12; *Defs. Opp.* 24:20–25:10; *see also Defendants' Opposition to Plaintiff's Statement of Uncontroverted Facts*, Dkt. # 171-3 ("*PSUF Opp.*"), 504–18. That evidence, however, has been authenticated by a person with personal knowledge. *See Declaration of Yasuhito Hirowatari in Support of Opposition to Defendants' Motion for Summary Judgment*, Dkt. # 173, ¶¶ 22–25; *see also Pl. Opp.* 21:15–23 (citing Fed. R. Evid. 901). And finally, to the extent Defendants believe their activity constitutes Fair Use, *see Defs. Opp.* 25 n.14, then they should have presented evidence of this defense in their papers. *See Leines v. Homeland Vinyl Prods., Inc.*, No. 2:18-cv-00969-KJM-DB, 2020 WL 4194054, at *12 (E.D. Cal. July 21, 2020) ("A plaintiff moving for summary judgment is not obligated to negate affirmative defenses, but an affirmative defense will negate summary judgment where each element of the affirmative defense is supported by summary judgment evidence." (citation omitted)); *see also Pl. Reply* 12 n.14.

As such, the Court **GRANTS IN PART** summary judgment to Plaintiff as to MODS' liability for infringement of the Photographed Works. However, as to Dahoo's liability, the Court finds that there is a triable issue of fact for the jury. Specifically, it is not clear to what extent Dahoo oversaw or assisted MODS with marketing. *See DSUF* 12, 14, 28; *see also Pl. MSJ* 24:1–7. The Court thus **DENIES IN PART** summary judgment to Plaintiff as to Dahoo's liability and **DENIES** summary judgment to Defendants.

*b. The Exhibits*

The Court now turns to whether the MODS Exhibits—*Season Dream* and *Galaxy Dream*—infringed on *Boundaries* and *Crystal Universe*. To prove infringement here, Plaintiff must show that Defendants "copied protected aspects of the [Exhibits]." *See Skidmore*, 952 F.3d at 1064. This "element has two distinct components: copying and unlawful appropriation." *See Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (citation omitted).

Absent direct evidence of copying, proof of copying can be proved with circumstantial evidence that "the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Skidmore*, 952 F.3d at 1064. But where a finding of probative similarity "may be based on the overlap of unprotectable as well as protectable elements," unlawful appropriation requires substantial similarities in the protectable expression only. *Id.*

To establish unlawful appropriation, courts in the Ninth Circuit require a finding of substantial similarity under both an "extrinsic" and "intrinsic" test. *See, e.g.*, *id.* at 1064. "At summary judgment, courts apply only the extrinsic test; the intrinsic test . . . is exclusively the province of the jury." *Morrill v. Stefani*, 338 F. Supp. 3d 1051, 1058 (C.D. Cal. 2018) (citing *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072, 1077 (9th Cir. 2006)). When applying the extrinsic test, courts "compare[] the objective similarities of specific expressive elements in the two works[,] . . . distinguish[ing] between the protected and unprotected material." *Id.* Protected elements do not include "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is . . . embodied in such work." 17 U.S.C. § 102. However, "[o]riginal selection, coordination, and arrangement of unprotectible elements may be protectible expression." *See L.A. Printex Indus., Inc. v. Aeropastale, Inc.*, 676 F.3d 841, 846 (9th Cir. 2012), *abrogated on other grounds as recognized by Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253 (9th Cir. 2021). If the Court finds that the extrinsic test is met, then the matter survives summary judgment and proceeds to trial where the jury applies the intrinsic test, which looks to whether the ordinary, reasonable person would find "the total concept and feel of the works to be substantially similar." *See Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017) (citation omitted).

### *1. Access and Probative Similarity*

Access and probative similarity is met here. The purpose of this prong is to assess whether Defendants' works were likely a product of copying or independent creation. *See Skidmore*, 952 F.3d at 1068. Even though access can be proven through "a trivial showing" of widespread dissemination, *see id.*, the record contains unrefuted direct evidence that Defendants' works were—as Defendants' CEO, Charles Chang, puts it—"illuminated by" Plaintiff's exhibits, *see PSUF* 315–17. This also includes evidence cited above that Defendants were using TL Images to market the MODS Exhibits before they were finalized. *See PSUF* 314, 324–25; *DSUF* 27–30. Thus, where Defendants had access to Plaintiff's Exhibits and the contested works share obvious similarities, the first prong is met. The Court thus finds in favor of Plaintiff on this issue alone and focuses its analysis on the issue of substantial similarity.

*2. Sufficiency of Evidence*

Before comparing the TL and MODS Exhibits, the Court addresses an issue raised in Defendants' papers regarding the sufficiency of available evidence of *Crystal Universe* and *Boundaries*. Specifically, Defendants argue that they are entitled to summary judgment because Plaintiff failed to proffer a "clear and complete record" of *Boundaries* and *Crystal Universe* "as a whole." *See Defs. MSJ* 14:11–16:14; 19:18–20:7.

The Ninth Circuit has consistently held that to establish substantial similarity, "the two works must be compared side-by-side." *See, e.g.*, *Experian Info. Sols., Inc. v. Nationwide Mktg. Servs. Inc.*, 893 F.3d 1176, 1186–87 (9th Cir. 2018). This requires "sufficient evidence of content to make a fair comparison." *Id.* (citing *Data E. USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 207 (9th Cir. 1988)). And where there is insufficient evidence in the record to enable such a comparison, a defendant is entitled to summary judgment. *See Antonick v. Elec. Arts, Inc.*, 841 F.3d 1062, 1066 (9th Cir. 2016).

Despite the numerous image and video files, as well as floor plans and other technical documents, *see Plaintiff's Continuing Statement of Uncontroverted Facts*, Dkt. # 172–1 ("*Supp. PSUF*"), ¶ 582, Defendants find it fatal to Plaintiff's claims that the record lacks a full-hour recording of *Boundaries* or a video depicting every possible lighting permutation in *Crystal Universe*. *See Defs. MSJ* 14:11–16:14; 19:18–20:7. The Court does not, and to fashion such a rule would be impractical. For example, a jury need not play a video game start to finish to determine whether the audio-visual work of one game is substantially similar to that of another; it can consider still photographs instead. *See Data East USA, Inc.*, 862 F.2d at 207. Similarly, the still photographs and available recordings of *Boundaries* and *Crystal Universe* are enough to enable a "fair comparison" between the TL and MODS Exhibits. *Accord id.* at 207.

*3. Comparison of* Crystal Universe *and* Galaxy Dream

As to *Crystal Universe* and *Galaxy Dream*, the Court first addresses the scope of protection afforded to *Crystal Universe*. Specifically, Defendants argue that *Crystal Universe* contains no protectible expressive elements and, at most, the combination of these elements is only entitled to "thin" protection. *See Defs. MSJ* 9:3–15.

Whether a work is entitled to thin or broad protection governs the analysis under the extrinsic and intrinsic tests. *Mattel*, *Inc. v. MGA Entmt, Inc.* 616 F.3d 904, 913–14 (9th Cir. 2010). When a work is entitled to broad protection, another work "will infringe it if it's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 19-6906 PSG (GJSx) | Date | January 6, 2023 |
| Title | teamLab Inc. v. Museum of Dream Space, LLC et al. | | |

'substantially similar' to the copyrighted work." *Id.* at 914. But if copyright protection is "thin," then "a work must be 'virtually identical' to infringe." *Id.*

"The scope of protection depends on the breadth of expression of a work's idea." *See Desire, LLC*, 986 F.3d at 1260 (citation omitted). A work is only entitled to "thin" protection when the range of choices available to the author is limited as "dictated by subject matter or convention." *See Rentmeester*, 883 F.3d at 1120. As the Ninth Circuit observed in *Satava v. Lowry*, the range of original choices available to an author who chooses to make a life-like glass-in-glass sculpture of a jellyfish is narrow. *See* 323 F.3d at 811–12. But "the greater the range of creative choice that may be made, the broader the level of protection that will be afforded to the resulting [work]." *See Rentmeester*, 883 F.3d at 1120.

*Crystal Universe* is entitled to broad protection because the "range of creative choices open to [Plaintiff] in producing" an art installation depicting the cosmos, stars, and galaxies is "exceptionally broad; very few choices were dictated by convention or subject matter." *See id.* And even though other artists have utilized mirrors and lights to create the sense of infinite space, *see Defs. MSJ* 17:28–18:4; *see also Connerton Rep.* 15–18, "there are [nonetheless] gazillions of ways to combine" lights and reflective surfaces to achieve that aesthetic, "in contrast to the limited number of ways to, for example, 'paint a red bouncy ball on black canvas' or make a lifelike glass-in-glass jellyfish sculpture." *See Desire, LLC*, 986 F.3d at 1260 (citations omitted); *see also Dr. Christiane Paul Expert Report*, Dkt. # 153-4 ("*Paul Rep.*"), 8–16.

Plaintiff's use of suspended strands of multiple LED lights inside a mirrored room that flank the sides of a mirrored walkway is an original expression of the theme of infinite space. *See PSUF* 69–70, 123, 222, 461; *DSUF* 57; *see also Declaration of Yasuhito Hirowatari*, Dkt. # 157 ("*Hirowatari March 14 Decl.*"), ¶¶ 119–122, 127–130, Exs. U, W. Plaintiff also chose to hang the strands symmetrically in grids or concentric circles, depending on the room, to fill the space and create depth. *See PSUF* 459; *see also Declaration of John M. Griem, Jr.*, Dkt. # 150-13 ("*Griem Decl.*"), ¶¶ 27–31, Exs. 25–29 (Floor Plans of the Different Versions of *Crystal Universe*). Unique choices were made to ensure the lights resembled stars and galaxies. *See PSUF* 468. This included (1) the size of the LED lights, (2) the choice of the colors blue, pink, purple, and white, (3) the fact that the lights are programmed to blink, and (4) the manner in which they blink—at times appearing to move up and down the strands or horizontally across the lighting array followed by fleeting moments of darkness. *See PSUF* 463–64, 466, 474, 476, 478,

480–83. The lighting simulation is also interactive, as viewers can control the pattern and speed of the blinking lights as they pass through the exhibit.[2] *PSUF* 232, 235.

Although each element on its own may not be protected, the original selection and coordination of these elements differentiate *Crystal Universe* from the other works showcased in Dr. Connerton's and Dr. Paul's expert reports. *See Connerton Rep.* 15–18; *Paul Rep.* 8–16. For example, the other works appear to use individual LED bulbs or hanging LED lamps, rather than strands, that are placed throughout an open space or in single lines against the walls or ceiling. *See Paul Expert Report* 8–16. The other exhibits do not utilize the same color scheme nor do the lights blink or change colors, remaining mainly fixed. *See id.* Considering the range of creative choices Plaintiff made, *Crystal Universe* is entitled to broad protection.

Having made those initial observations, the Court now analyzes whether the selection and arrangement of the works' elements are substantially similar under the extrinsic test. Defendants are correct that similarities as to theme and the use of a three-dimensional array of LEDs, reflective surfaces, and a computer-programmed lighting simulation are not protectable. *See Defs. MSJ* 19:6–10. But the Court has identified the protectable expression above through Plaintiff's original selection and coordination of these elements. *See Rentmeester*, 883 F.3d at 1121 (highlighting creative choices made as "to lighting, camera angle, depth of field, and selection of foreground and background elements"). And looking to the protectable expression only, the Court finds that *Crystal Universe* and *Galaxy Dream* are substantially similar, if not virtually identical, under the extrinsic test.

The spatiality, lighting simulation, and color changes of *Galaxy Dream* so closely resemble *Crystal Universe* that the Court must necessarily "set out to detect the disparities." *See id.* *Galaxy Dream* contains similar strands of LED lights of comparable size that hang floor-to-ceiling in a grid formation inside a mirrored room and flank a reflective pathway. *See PSUF* 458, 460, 462; *see also Declaration of Scott Sholder*, Dkt. # 158 ("*Sholder Decl.*"), ¶¶ 10–11, Exs. G-3, G-4. The lighting simulation resembles stars and galaxies and utilizes blinking lights that change colors between blue, pink, purple, and white. *See PSUF* 463, 465, 467, 469, 470, 484–87. And the pattern in which the lights blink gives the effect that they are moving vertically up the strands and horizontally across the lighting arrays much like in *Crystal Universe*. *See id.*

[2] Defendants argue that the infringement analysis is obscured by the variations of *Crystal*. The Court agrees that there are differences between the exhibits but also finds that the protectable expression noted here appears common amongst each version, as even recognized in Defendants' statement of uncontroverted facts. *See DSUF* 39, 42–48.

475, 477. The differences, however, include the size and shape of the spaces and pathways, the number of strands utilized, the lack of interactivity, and the limited lighting choreography compared to *Crystal Universe*'s 28 preset patterns. *See Connerton Rep.* 6, 19–20; *Connerton Rebuttal Rep.* 10. But these differences are not enough to upset the Court's conclusion.

*Crystal Universe* and *Galaxy Dream* are thus substantially similar under the extrinsic test. But whether they are substantially similar under the intrinsic test is a question exclusively left to the jury. *See Funky Films, Inc.*, 462 F.3d at 1077. The Court accordingly **DENIES** summary judgment to both Plaintiff and Defendants on the question of substantial similarity.

*4. Comparison of* Boundaries *and* Season Dream

Like *Crystal Universe*, Defendants advance a conclusory argument that *Boundaries* is also entitled to only "thin" copyright protection by the mere fact that *Boundaries* depicts flowers and water. *Defs. MSJ* 21:19–23. But once again, Defendants are off base.

*Boundaries*, much like *Season Dream*, is an interactive exhibit, controlled by computer programming, that expresses the passage of time and seasonal change through video projections of digital artwork—none of which are protectable elements. *See PSUF* 125, 170–75, 403–411, 425–431, 436. The digital artwork in *Boundaries*, however, is highly stylized, "depict[ing] not flowers [and water] as they appear in nature but an artistic combination of floral [and aquatic] elements that is sufficiently original to merit copyright protection." *See Desire LLC*, 986 F.3d at 1261 (citation omitted); *see also Paul Rep.* 20–22. And "[b]ecause there is a 'wide range of expression' for selecting, coordinating, and arranging [these] elements in stylized [digital art]," *Boundaries* is entitled to broad protection. *See L.A. Printex*, 676 F.3d at 850 (quoting *Mattel*, 616 F.3d at 913).

Given the broad protection afforded *Boundaries*, the Court concludes that *Boundaries* and *Season Dream* are substantially similar under the extrinsic test. For artwork, courts may consider "the subject matter, shapes, colors, materials, and arrangement of the representations . . . in determining objective similarity in appearance." *See Cavalier v. Random House, Inc.*, 297 F.3d 816, 926 (9th Cir. 2002). Both exhibits convey the same themes through similar subject matter of flowing water and flowers. *See PSUF* 52–55, 348–49. Both exhibits utilize a similar arrangement of video projection. Specifically, the projection depicts water and flowers flowing from the ceiling, down a singular wall, and across the floor of a rectangular room at what appears to be similar speeds with additional projections, including small fluttering butterflies, along the side walls. *See id.* 355–58, 413, 414. *Boundaries*' highly stylized depiction of water

as thin individual streams of white and pale blue light is replicated by *Season Dream*. *See id.* 53, 354, 432–33. The works each encompass clusters of two-dimensional, flattened multicolored flowers intertwined with the flowing water that change as the exhibits cycle. *See id.* 359–61, 364–65, 366–86. And at times, the choices as to color and style of the floral arrangements significantly overlap. *See Paul Rep.* 23–24 (comparing photographs). Finally, *Boundaries* and *Season Dream* each contain an interactive component that incorporates the shapes of its viewers into the work. *See PSUF* 425–31. For example, when a viewer engages *Boundaries*, the water parts around them and flowers bloom in the shape of the individual. *See id.* 200. In *Season Dream*, a shimmering white outline of an individual's silhouette appears amidst the flowing water. *See DSUF* 23.

There are, however, objective differences between the two works. The spatiality of the streams of light, which represent water, is much more centralized in *Boundaries* compared to *Season Dream*. *See Connerton Rep.* 6. At times, *Season Dream* incorporates different color schemes than *Boundaries*, and its flowers do not always cluster. *See Connerton Rebuttal Rep.* 8, figs. 9–12. *Season Dream* also includes other elements that are not present in *Boundaries*, such as snowflakes and maple leaves. *See Defendants' Continuing Statement of Uncontroverted Fact*, Dkt. # 171-3 ("*Supp. DSUF*"), 94. And finally, while both works contain an interactive component that reacts to the viewer's position within the space, the result is different. *See Connerton Rebuttal Rep.* 9, figs. 13–14.

Although "[n]o brightline rule exists as to what quantum of similarity is permitted before crossing into the realm of substantial similarity," the aspects of the works that appear similar seem "qualitatively important" to *Boundaries*. *See Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987). This particularly includes the unique interpretation of flowing water and its arrangement within the space, as well as the floral elements. As such, the Court concludes that the works are substantially similar under the extrinsic test but leaves the remaining intrinsic analysis to the jury. For this reason, the Court **DENIES** summary judgment to Plaintiff and Defendants.

*c. The Music Video*

Plaintiff moves for summary judgment as to whether Defendants are liable for vicarious and/or contributory infringement for the Bieber Music Video. *See Pl. MSJ* 25:6–25. But to establish Defendants' liability, Plaintiff must first show direct infringement from the public display of the MODS Exhibits in the Music Video. *See Werner*, 2020 WL 3213808, at *6. Because this element ultimately hinges on whether *Season Dream* and *Galaxy Dream* are substantially similar to *Boundaries* and *Crystal Universe*, summary judgment is inappropriate. *See Pl. MSJ* 25:6–9 (acknowledging as much).

Further, unlike *Galaxy Dream*, Defendants created a new version of *Season Dream* ("*Season II*") that was featured in the Bieber Music Video. *See DSUF* 26; *see also Sholder Decl.* ¶ 41, Ex. KK (Justin Bieber Music Video) ("*Bieber Music Video*"). Some of the "qualitatively important" elements identified above are still present in *Season II* and captured in the Music Video, *see Bieber Music Video*, such that the Court finds *Season II* is substantially similar to *Boundaries* under the extrinsic test. *See Baxter*, 812 F.2d at 425. But there are enough objective differences between *Season Dream* and *Season II* that a jury could find the former intrinsically similar but not the latter. For example, the water and flowers are only depicted along the floor in *Season II*, while the back wall showcases a full moon. *See id.* The jury will thus have to make an additional determination as to whether *Season II* is substantially similar to *Boundaries* under the intrinsic test.

As such, the Court **DENIES** summary judgment to Plaintiff on this issue.

*iv. Damages*

Defendants are also not entitled to summary judgment on the issue of damages. *See Defs. MSJ* 24:8–25:4. A "copyright owner is entitled to recover [1] the actual damages suffered by him or her as a result of the infringement, and [2] any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1087 (9th Cir. 2014). "Actual damages are the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." *See id.* (citing *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 512 (9th Cir. 1985)). This may be based on a "hypothetical-license theory," which looks to "the amount a willing buyer would have been reasonably required to pay a willing seller at the time of the infringement for the actual use made by [the infringer] of the plaintiff's work." *See id.* (citing *Wall Data Inc. v. L.A. Cnty. Sheriff's Dep't*, 447 F.3d 769, 786 (9th Cir. 2006)). Although "uncertainty as to the fact of damages may" preclude recovery, "uncertainty as to the amount of damages will not." *See Frank Music Corp.*, 772 F.2d at 513.

The Court is satisfied that there is sufficient evidence in the record that a jury could find a causal connection between any infringement and damages. For example, Plaintiff can present evidence as to what it generally would have cost Defendants to license Plaintiff's Exhibits and Images for display in their museum and on their website. *See Pl. Opp.* 23:20–24:8. Additionally, Plaintiff can establish damages through Defendants' direct and indirect profits from infringement. *See Polar Bear Prods., Inc. v. Timex Corp.* 384 F.3d 700, 711 (9th Cir. 2004). To the extent a jury finds that a third of the MODS Exhibits were copied and unlawfully

appropriated, it can also find a causal connection between Defendants' infringement and profits off ticket sales. Further, "[p]rofits indirectly gained from infringements used in promotional efforts, as is the case here [with the Photographed Works], fall squarely within the rubric of wrongful profits." *See id.*

As such, the Court **DENIES** summary judgment to Defendants on the issue of damages.

*v. Defendant Dahoo's Liability for Infringement*

Finally, Defendants urge the Court to grant summary judgment as to all claims of infringement brought against Dahoo as the parent company of MODS. *See Defs. MSJ* 25:9–25. "A parent corporation cannot be held liable for the infringing actions of its subsidiary unless there is a substantial and continuing connection between the two with respect to the infringing acts." *Frank Music Corp.*, 772 F.2d at 519.

A jury could find that such a connection exists here. Specifically, genuine issues of material fact exist as to Dahoo's involvement in the alleged infringing activities given that MODS is a wholly owned subsidiary and Defendants shared a CEO, who admits to having overlapping responsibilities between the two companies. *See PSUF* 536; *accord Werner*, 2020 WL 3213808, at *6. And finally, spoilation of evidence prevented Plaintiff from discovering potentially relevant evidence about Dahoo's involvement, which warrants a negative inference. *See Pl. Opp.* 25:20–21.

The Court accordingly **DENIES** summary judgment to Defendant Dahoo.

D. <u>Conclusion</u>

For the foregoing reasons, the Court **DENIES** Defendants' motion for summary judgment in its entirety and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment, as follows:

- The Court **GRANTS** summary judgment to Plaintiff on the issue of copyright ownership in its Exhibits and Images.

- The Court **GRANTS** summary judgment to Plaintiff that MODS infringed on Plaintiff's Images and Exhibits by displaying the Photographed Works

on their social media sites but **DENIES** summary judgment as to Dahoo's liability.

- The Court **GRANTS** summary judgment to Plaintiff on the issue of access, probative similarity, and substantial similarity as to the contested exhibits under the extrinsic test but **DENIES** summary judgment under the intrinsic test.

- The Court **DENIES** summary judgment to Plaintiff on whether Defendants vicariously or contributorily infringed on Plaintiff's exhibits through the Bieber Music Video.

## IV. Conclusion

In conclusion, the Court **DENIES** Plaintiff's motion to exclude the expert testimony of Dr. Kimberly Connerton, **DENIES** Defendants' motion for summary judgment, and **GRANTS IN PART** and **DENIES IN PART** Plaintiff's motion for summary judgment.

The following issues remain for trial: (1) whether Defendants' exhibits *Season Dream*, *Season II*, and *Galaxy Dream* are substantially similar to *Boundaries* and *Crystal Universe* under the intrinsic test; (2) whether Defendants vicariously or contributorily infringed on Plaintiff's Exhibits through the Bieber Music Video; (3) Dahoo's liability as a parent corporation for the infringing activity of its subsidiary; and (4) Plaintiff's damages.

The Court also **SETS** a scheduling conference for **February 17, 2023, at 2:00 p.m.**

**IT IS SO ORDERED.**